Case number 071095, People v. Damon Goodwill. Step up. Each of you will have 15 minutes. Introduce yourselves, please. My name is Scott Lane on behalf of Damon Goodwill. Okay. It doesn't say to turn to Google if you're on behalf of People. Say that again? Sure. Google. Okay. U-Z-I or how does it spell? E-U-Z-Z-I. Okay. Each of you will have 15 minutes to present your version of it. The appellant will break his up because he'll have a chance to rebut. Speak clearly because you are being recorded. Okay? Do you want this microphone up? Is there a reason? I don't know. I suppose they'll hear you right there. If it's set there, they must – I don't know how they want it. They probably just moved it out of the way for the cleaning. They probably didn't want to be recorded. That's probably for the best. It could be. All right. You may begin. Good morning, Your Honor. Good morning. May it please the Court. My name is Scott Lane, and I'm appearing on behalf of Damon Goodwill. I would like to focus my attention on the first and second issues in the brief. I'll be happy to answer any questions this Court has in regards to any portions of the brief not discussed. Additionally, I would like to reserve a few minutes for rebuttal. Damon Goodwill was convicted of first-degree murder after a trial in which critical identification evidence was admitted in violation of his right to confrontation. The jury was instructed on a legal theory that was not supported by the evidence, and his trial counsel failed to make use of valuable impeachment evidence against the only witness in court who placed Goodwill near the scene. Because of the highly prejudicial nature of the confrontation error, because of the confusion and lack of confidence in the jury's verdict regarding the latter areas, and because of the closeness of the evidence in this case, Goodwill was denied his fundamental right to a fair trial. What's your argument on Crawford? I mean, I don't even know why Crawford gets in this case. Well, I think Crawford, I mean... Do you know the case T.T.? I'm aware of the case T.T. It's not been briefed in this manner. I know. I'm just asking if you know it, because that was the case I had, and Judges, for Sard, it would be overwhelmed by your posture in this case. You would be definitely anti-your posture, saying that the intent either of the person making the statement or the intent of the police officer has to be determined beforehand. Well, I think that I would direct this Court's attention to People v. Sutton, the Illinois Supreme Court case in which they initially, when they were looking at it in terms of they resolved any sort of doubt in terms of who intent should govern. When it's police officers speaking, it's the intent of the police officers in terms of whether or not the information that's sought... So it's your theory all police officers are testimonial? No, no, absolutely not. But I think that what Sutton made clear was that that first step, that first stage in terms of determining whose intent governs, they offered a clear statement that in this situation, it would be the intent of the questioner when making that initial sort of foray. But more importantly, I think that why we get to the constitutional issue here is because we have a case, I mean, because of the importance of Sutton and how closely Sutton sort of lines up with our facts, I think that it's critical that this Court go through the analysis that has been laid out by Sutton to address the constitutional errors. In this case, we have a situation where there's a shooting just a few minutes earlier than this identification. The individual who was apprehended initially said his name was something different than Damon Goodlaw, and he then produces information that says he was Damon Goodlaw. With the officer knowing that there are men out there willing to use their guns, isn't that the type of situation where they're doing it and trying to stop or alleviate an emergency? Well, I mean, we're confronted with facts. I mean, there's two sets of statements that we're dealing with. There are the initial statements, obviously, when the police respond. I mean, the shots are fired. We don't know exactly at what moment the shots are fired. They're responding to a call of shots fired at 3, 158 AM. They're responding, obviously, to a crime scene at that point, and they arrive, and people direct them to the back where they find the victim, Pierre Jones. At that point, now we have our initial set of statements. We have the statement of, you know, Damon shot me, and then that he was wearing a black hoodie. Again, I think that here on that first statement, we're dealing with a fairly close factual, you know, it's a close call in terms of whether or not this would, how this would be governed under the analysis of Sutton. I think that, you know, the statements that the, when they're talking about Sutton and also in Davis, I mean, they start to, the U.S. reported Davis, is dealing with the fact that, you know, Davis are often the ones who are responding to, obviously, serious incidents that are out on the street, but it doesn't seem as though Sutton was out there trying to create some sort of testimonial hearsay exception for these first statements made by any victim there at the scene. And Davis, you know, did confirm at that point that there, you know, there may be certain exigencies that may often create an exception, but they were not creating a categorical one. And so looking at what we have here, we have statements of identification, not just sort of statements of having to do with how to apprehend or who we're looking for. So I think just on the basis of one of identification, I think is at least worthy of taking a critical look at determining whether or not that would allow it to fall under the idea of a testimonial statement as opposed to statements in terms of resolving an ongoing emergency. But, you know, critically, you know, the way that Sutton set up its analysis, we're dealing with two sets of statements and we're dealing with two separate times in terms of this incident happening. Of course the police need to be out there and attempting to, you know, follow up on any sort of leads. I mean, what we're dealing with now is in terms of a defendant's right to be able to confront that evidence when it's being introduced in terms of testimonial hearsay. In Sutton, they made clear that the show-up statements, the second statements of identification that occurred in the back of the ambulance are testimonial. And their admission absolutely violated Goodloe's right to confrontation at that point. In Sutton, while in the ambulance, the officer initiated a conversation with the victim in order to determine what happened. The offender at that point was still at large. Then, despite the state's contention in that case, that because they were in a residential area, the victim, the officers, and anyone who might encounter the assailant may be in imminent danger. The court found that the officers' questions were not directed at addressing the ongoing emergency. The court noted that by the time the victim was placed in the ambulance, the crime scene had been secured. The statements in that case were thus found to be testimonial. In this case, clearly the show-up statements and gestures from Jones in the ambulance were also testimonial. Multiple police officers... Why is it so clear? Well, we have, at this point, we have multiple police officers on the scene. We have paramedics on the scene. We have Goodloe in custody at that point. He's already been searched and found to not be in possession of any weapons. He was in handcuffs. He was brought to the scene. And, you know, under these circumstances, because Jones nor the officers were no longer in any danger, there has to be, at some point, a cutoff to this notion of an ongoing emergency. But wasn't there a question about whether or not they... Although Damon was in custody, isn't there a question about whether or not he was actually the perpetrator, seeing as how he gave a false identity in the initial questioning by the officer? There's some question because there may well have been someone else still out there. There's always that question. There's going to be that question in any criminal investigation. But that goes to helping resolve the emergency. Is it an emergency at that point, though? I mean, this notion of an ongoing emergency doesn't mean that in every violent crime there's always going to be some unknown assailant that's out on the streets that potentially is going to be causing a danger. But that does not give the police, basically, the opportunity to, you know, that the entirety of their criminal investigation up until the point of charging, I mean, when can we cut that off? I mean, when... Even at that point, even, you know, upon the show-up identification, we can't be certain at that point that that's actually an accurate... that that's absolutely going to be the offender, that any notion of the, you know, danger that might be out there has been resolved. I mean, again, looking at our facts, theoretically, there might be other shooters out there. But that's, you know, what Sutton, I think, was absolutely concerned with, is the fact that once the crime scene is secured, and I think we have a secure crime scene at this point, we're no longer concerned with resolving this ongoing emergency. I mean, how far out can we spread that notion of an ongoing emergency? What about giving me a little discussion on dying declaration and excited utterance? Well, I think that, obviously, the first thing we have to do is look to the state grounds for the hearsay, absolutely. And while we can see it in our briefs that the first statement of, Demone shot me and that he was wearing a black hoodie, the court probably found that to be an excited utterance. We maintain that by the time... because of the time that it elapsed since the initial sort of starting event of whatever had happened out there on that corner, and the lack of spontaneity in that statement, because it's no longer just being uttered upon sort of the first arrival of a responder, we're now dealing with repeated questioning by the police officers and possibly also the paramedic dealing with what had occurred. The trial court at that point, I think, was incorrect in concluding that Jones' statements and gestures of identification at the show-off were excited utterances. The show-off identification statements should have been excluded under a state hearsay ground because the excitement of the event at that point no longer predominant. At that point... Again, this is looking at the totality of the evidence. You have to look at all the facts... Pardon me? Absolutely not. It would, again... We're not dealing with a situation where you may never forget or that that's not going to have an impact, obviously. And if you made a statement, wouldn't that be considered an excited utterance? How long after that... You tell me. I think that there has to be a point at which it's cut off. What's that point, in your mind? I wish that there were a bright line, but of course there isn't. I think you have to look to each and every case and deal with their own facts. For us to overrule that court's decision, we have to find certain things. Would you tell us what certain things we have to find? We'd have to find that the trial court abused its discretion, obviously. That he violated his discretion or abused his discretion. Correct. As Justice Smith and I just quizzed you on excited utterance duration of time from when the event occurred to when you think it's over, you never gave a real answer, did you? I can't give you a moment in time at which that excited utterance would end. How then did the judge abuse his discretion? I think because the judge did not take into account the proper amount of facts. And one thing I would like to direct this court to... Answer my question before you go off. Let me answer your question. The judge did abuse its discretion when he was given information that was misleading when making that ruling. He was told that this show-off identification was happening within two to three minutes of the initial shooting. So when he was making his ruling saying that the excitement of the event predominated, it was under a false assumption of how much time had elapsed. But you will agree that there are cases going for extensive... Absolutely. All the way up to six and a half hours. But in that case, the man's been in the trunk the entire time. That would make a difference. Absolutely it would make a difference. He's been shot. He's in the trunk and with a dead body, I believe. Obviously the excitement is going to be carrying on. In this case, the facts show that when the police arrived on the scene, they heard someone moaning when they pulled up in front of the house. And it turned out the victim was all the way back to the house, into the alley, rolling around his back in pain. When he was put into the ambulance, the victim was having difficulty breathing, apparently. What about that is not shocking? I fully admit that there were... We're not saying that this is... This is a closed question, but I do think that given the record that we have before us in which the court was not being adequately provided with the proper information when making this determination, again, those initial statements, we admit them. We just think that by the time, you know, 10 to 15 minutes later, possibly up to 25 minutes after the shooting, that he's in the ambulance, he's being treated, he's being given the albuterol, which actually is a muscle relaxant. It helps sort of relax the bronchial muscles, so it sort of, if anything, would be designed to calm him down. Unlike certain cases in which the victim was having difficulty responding to questions of sort of coming in and out, questions of awareness, there's nothing in our record here that indicates that he was having any sort of difficulty being cognizant of being around him, being able to respond cogently to the responses. He's able to sort of lean forward and point, yes, that's the guy who did it. Again, this is a cold record. We're left with sort of making a consideration of what that's based on. I just, you know, I think that, you know, again, this has to be dealt with factually, case-by-case, and I think in this situation, that second set of statements would fall under, would be an abuse of discretion for the court to find an exception. What would you have this appellate court do? What is your remedy? Well, our remedy here, if we were to exclude, I mean, that's the interesting thing. Even if this gets knocked out, the second statement, the show-up identification under the state, this court still has to go on and review the federal, the question of the testimonial statements about whether or not the initial, whether both of those statements would be testimonial. Finding that initial statement, if we were to find that the, I'm sorry, the second identification statement, show-up were excluded on state grounds, this court would have to determine if that error was harmless under the lesser sort of standard of harmless error analysis. If this court finds, pursuant to Sutton, which I think Sutton clearly outlines, that that second statement of show-up identification was a denial of his constitutional right to confrontation, then this court would have to find the state, the state would have to meet a burden that that error was harmless beyond a reasonable doubt. And now, at that point, what we're asking this court to do is reverse our demand for a new trial because our belief is that there is no way to determine that this did not have some impact on the trier effect. This statement of identification is perhaps the strongest evidence, you know, it's the only direct evidence linking our client to the shooting would be the show-up identification. How do you get rid of the excited utterance that you agree is correct, the first one? I agree that it's correct under state grounds. I disagree that it would be admissible under the federal constitutional, under the Sutton analysis. There was another witness who saw your client at the scene. We have another witness who saw our client at the scene, Michelle Levick, but, you know, to pay more attention to her testimony, I mean, again, there is significant problems in the fact that that's where our second issue comes in, in the fact that there was, you know, significant impeachment evidence out there which was not utilized when handling her testimony. But her testimony just basically places him at the scene with another individual, taking it as true. That, you know, presence in the area of the crime scene, there's no testimony that she saw him with a gun, no testimony that she saw someone else with a gun, no one sees anyone firing any of these shots, no one sees, I mean, there's basically bullets are coming in opposite directions. So she was maybe a liar? I'm not saying that she's a liar, but I'm saying that we have to... Well, if there was shooting, from what I read, there were six .45 caliber slugs laying there, and there were two or three from the weapon that we were talking about that I guess someone else had. There were two different weapons, is that right? Well, at some point in time... Were there two different weapons? At some point in time, two different weapons were there on that intersection. We have nothing to tie either of the casings directly... What bullet was found in him? Oxidized bullet from... Well, that's a different situation. He'd been shot before, so he might take the posture that he likes gunshot wounds. We would never take that posture, but... The way you briefed that, it seemed like it was something that, in his life, it was, I guess in the jargon, would be cool. I don't think it was cool, and I don't think he wanted to be shot by a gun. I apologize if that's... No, no, I just thought that you built sort of an immunity after you're shot once, it's kind of a thing. I don't think it's a thing. I understand. But the bullet was from what kind of a gun was it? The oxidized bullet? No, the one I want to talk about. Well, I don't think there was a bullet that... I mean, it was a through-and-through gunshot wound. They found a bullet, though, from that? They must have determined what kind of gun it came from. From my understanding of the record, they obviously were able to determine that casings... That's what I want. Yeah, the casings matched up with... I think there was a discarded bullet. Again, I'm... That was the other one from across the street that was shot. From across the street that matched up, but these casings... They matched up, right? Well, they didn't match up necessarily to this case. We don't know... Again, we have no real connection between any of the bullets that are fired with these casings that are recovered. We just know... The closest that we can get is through the one witness logins testimony, which indicated there was bullets being fired on both sides of the street. Is this Lovett, the female? Lovett is the female. Did she say they were shooting her? I thought she said she didn't see anything. She didn't see anything. She heard gunshots and ducked down in her car. She heard gunshots. She was right there at that intersection? She was close to that intersection, sitting in her car with Jonathan Townsend. She had known Damon Goodloe for over a year at that point. She put him at the scene, right? Well, not initially. When she first spoke to police officers, she just gave a general description. She gave complexion and that it was two male individuals in dark hoodies. Did her statement evolve? At some point, her statement changed to... When did it change? Well, she obviously testified at trial, indicating that she told the officer that night that she identified Damon as one of the shooters. In fact, she had not. And that's our second argument, that this was critical. That's why I said maybe she was a liar. I think that there's strong questions, and yeah, it's possible that she had lied in terms of making that identification. Because if you're sitting in a car and you hear shooting... Was this at 2 in the morning or something? Around 2 in the morning, somewhere in that vicinity. I don't know if it's an intersection there or lights are there or what, but she could have seen somebody shooting, but she said she didn't see anybody shooting. And then later on she says she saw him shooting. At one point in the... I believe that in the officer's notes of the description, she indicated that she saw two male individuals shooting. At trial, she then says that she did not see any shooting, that she had ducked down and just heard the gunshots coming from her left. We have another witness who also knows the defendant in this case, who indicated that he saw the two individuals in hoodies, but clearly testified that the defendant was not there that night. And so we have a conflict between those two testimonies. I mean, everything that we've talked about here for these past couple minutes, I think, directly points to the closeness of this case, which once we've... I think it points to some lying, lying in that closeness of the case. Well, once we have lying, then we have credibility determinations that are very questionable. And when a jury is confronted with this, might a improper... might the victim's identification of the defendant have an effect? I think it would be very crucial and very important. Absolutely. And I think that that's why, in this case, there's an absolute need for this to be reversed and remanded. But since it wasn't a dying declaration and was an excited utterance, and you say that some federal case prevails over state law in this first instance, is that what you're saying? Oh, no. I'm saying that the first step is that we have to evaluate these statements under state law. Well, let's call it an excited utterance. Once we call it an excited utterance. Let's call it that. We will, and that's what the trial court did. And? And we then move on to... Let's move on to that. Is that enough to convict him? An excited utterance? Yeah, that this nailed him, that this guy shot him, this guy killed him. What more do you need for a conviction? We need to subject that to cross-examination. Okay. You can't cross-examine a dead man, but Lovett's perhaps a liar. The other witness, that doesn't even make sense. So that's what you have in this case, isn't it? Right. We have one witness whose testimony, to allow in his testimony, would violate his rights. That's the federal case of Sutton. Is that what you're saying? Well, Sutton is the state in Illinois. Well, what case are you pointing to that says this court could not accept what he said as he lay there on the street? It's Sutton. Sutton is the one that's evaluating. Basically, we have post-Crawford, there's obviously, you know, all the jurisdictions are dealing with what this massive change, what this monumental shift in terms of handling unconfronted... Does Crawford take this case in your favor? Yes. I mean, because Crawford and the cases that are developing in its progeny, Davis and Hammond, which were the cases largely dealt with in the opening brief, and then Sutton, which is our Illinois Supreme Court, sort of reconciling how our courts are treating this precedent. And so with Sutton, they are applying the U.S. Supreme Court analysis and their own cases between Steckley and Rolando's G. Give us your best version of the analysis that you want to give us. That's the federal analysis. I believe our best analysis is in Sutton. And it's when dealing with this second set of statements, I think absolutely indicate that despite the fact that the offender was still at large, despite the fact that they were in this residential area where, and in that case, I mean, we've got much... You're assuming that the assailant is at large. The police assumed they had the assailant. That's a little divergence. Which absolutely strikes in our favor, because once the police assume that they have the assailant in their custody... Okay. I don't want to talk about that second part. I want to talk about the first part, why the first statement is in somehow violation of our defendant's... Our first statement, just when he's found on the street and he's indicating, Damone shot me, and that he was wearing a black hoodie. Again, I think that those are statements of identification that the witness is making. Unlike in Sutton, which were basically, my girlfriend has been shot, I've been shot, and the police were asking him where the offender was. In Sutton, the court specifically indicated that in approaching the officers, the man was clearly seeking help. Thus, any statements elicited were intended to resolve an unknown emergency with the police acting with the purpose of preventing future harm, rather than to simply learn what... That's a little different than this. Which would make it a little different? This is an excited utterance. He didn't know that he was going to die, but it fell under the auspices of excited utterance. But Sutton, too, was dealing with... Trying to determine whether or not this passes muster under the Sixth Amendment, under the U.S. constitutional right to confront that testimony. Was this testimonial or was this non-testimonial because it was elicited in an effort to resolve an ongoing emergency? Our contention is that that first set of statements, because these were statements of identification, which are clearly the types of statements that one contemplates, could potentially be used later at a trial. That that necessarily would make it fall outside and that would distinguish it from the first set of statements that Sutton... What I'd really like to emphasize, though, is that even if this Court were to accept that first set of statements, even if this Court were to accept that Damone shot me and that he was wearing a black hoodie, there's then the second statement of identification, which is a clear violation under Sutton and the Crawford progeny, that at that point, then, we need to engage in a harmless error analysis whether or not the admission of that identification... Basically, a direct pointing that that was the guy who shot me when he was actually pointing at me. But for analysis would not necessarily apply when you have the first utterance, but for this, he wouldn't be convicted. No, but in here, we're dealing with whether or not there's... What impact this could have on a trier fact and I think that once we're there and once we're then concerned with the fact that we have a witness who lied and once we have a witness whose testimony doesn't really offer much of anything and we have inconclusive or... I mean, not inconclusive, but we have sort of questionable circumstantial evidence surrounding that, this clearly would have an impact on a rational trier fact and we have a jury that was making findings that indicated that perhaps there was some sort of errors going on between what the court said in terms of that there was a possible inconsistency and what the jury ultimately concluded. So I think all of this outlines why, in this case, this error in terms of the admitting a show-up identification was not harmless beyond a reasonable doubt. Are you about done? Absolutely, and for these reasons, we ask that this court grant Damian Goodloe a new trial. Thank you. I'm going to ask you again, since I just looked on the brief and your name isn't on the brief. It is not on the brief, correct? Ugo Buzzi, last name is B as in boy, U-Z-Z-I. I'm here for the people of the state of Illinois. Thank you. I'd like to begin with the initial statements that were made just after the victim was shot and right when the police arrived. These initial statements, if you'll maintain, were properly admitted as excited utterances, non-testimonial excited utterances, and were properly admissible as dying declarations. To first address the issue of excited utterances, the defendant concedes on page 14 of his brief that these statements were indeed excited utterances, but challenges the court's finding that they were non-testimonial. Therefore, the issue here would be whether or not these statements are indeed non-testimonial. People maintain that they were non-testimonial because the police were responding to an ongoing emergency under the U.S. Supreme Court's decision in Davis. To look at the facts of this case, the police received a call of shots fired. Police arrived, they say, about a minute and a half later, and they find the victim lying on the ground in an alley, rolling around on his back, moaning in pain. Police then ask the victim, Who did this to you? And the victim responds, Damone. Damone shot me. What was he wearing? Or what did he look like, they ask. He was wearing a black hoodie. Clearly, at this point in time, the victim is under the excitement of having been shot in the leg. Shot through the femoral artery and the femoral vein. There was massive internal bleeding in the corner found, which was ultimately the cause of death. Essentially, this victim was lying on the floor, bleeding out through his leg. At this point, it's clear that the victim was under the excitement that the victim did not have time to fabricate his statement. He what? He didn't have time? He did not have time to fabricate his statement. A couple of minutes after he was shot lying on the ground. Okay, I just, I'm not, you know. The police were clear to respond in an ongoing emergency. We would also point this court to a Supreme Court decision in Sutton, which was decided a couple weeks after the people filed their brief in this case. The facts in Sutton are strikingly similar to the facts here, particularly for these initial statements. In Sutton, the police respond to a call of a man ringing doorbells and knocking on doors. The police arrive. The victim walks up to the police and tells them that he's been shot and robbed and that his girlfriend has been shot. And he has blood on his face, blood on his clothes. The police ask him, who did this to you? At that point, the victim actually gives a somewhat thorough description. Says it was a man with a mustache, 30 to 35 years old, black male. The police then ask, where did he go? And he points to the alley. Here we have a strikingly similar situation. The police arrive and ask the defendant, who did this to you? What did he look like? The court in Sutton found that those were excited utterances and that they were indeed non-testimonial excited utterances. And if I may just read a quick portion of Sutton for you. The court states, at this point the officers could not have known whether the assailant posed further danger to the victim or others and did not know whether the violence had ended or might continue elsewhere. The officers did not know whether the perpetrator was still in the immediate area or whether he would return to the area. We have the exact same situation here. The police arrive. All they know is if there were shots fired, they have a man shot in the leg on the ground in pain. The police don't know if the offender is still there. If the victim is still in danger, the police themselves are still in danger. And therefore, they were clearly responding to an ongoing emergency. Moving on to the dying decoration portion of this. People maintain that this was also a dying decoration. Clearly, the victim at this point was under the imminent belief that his life was in danger. He had been shot in the leg. As I said before, he was essentially bleeding out from the femoral vein and femoral artery. It's reasonable to believe that this victim believed at the time he gave his statements, only a couple of minutes after he had been shot, that death was imminent. What about being shot in the leg would give him reason to think he's going to die? Well, Your Honor, I think that being shot in the upper thigh, as I said, internal mass of bleeding, essentially bleeding out, I've never been shot, but I imagine whether I was shot in the abdomen or eight inches lower in the upper leg, I would imagine that my life was in danger and that death was imminent. Again, he was bleeding out. It seems to me that being shot a couple of minutes after... Well, that's your argument to get around Crawford, right? Excuse me? That's your argument to get around Crawford. Well, I don't know that we need an argument to get around him. I think that the excited utterance is supported by Crawford and Davis and Sutton. Clearly, dying decoration is not necessarily subject to a testimony versus not testimony analysis, as suggested in Crawford and Gilmore, for that matter. Now, moving on to the ambulance statement, the people maintain that this also was an excited utterance, a non-testimony excited utterance, and that it was a dying declaration. But before I even get to the substance of that, we posit that if this Court finds that the initial statements were properly admitted, this Court doesn't even have to get to the second. To the second statement. Because under a harmless error analysis, the evidence in this case was overwhelming. And because of the overwhelming nature, we believe that that error would be, if it were error, harmless beyond a reasonable doubt. Just to look at the facts that are present here. We have a witness that saw a defendant and another person walking past her towards the area where shots were fired. These two men are wearing black veins. This is Lovett's statement that we talked about. Then we have Loggins, who saw two men wearing black veins standing at the corner where the shooting took place, saw these two men shooting, but was not able to see their faces so was not able to identify either of the shooters. Although Lovett did identify the defendant as being one of the individuals that walked past her towards this point where she heard shooting.  that showed that it was consistent with the defendant having fired a gun with his right hand. We have, just as House pointed out, the point where the police find the defendant, the defendant gives him a different name, tells him his name is Mario. Then he hands him an ID that says his name is Dimone. And we have all that evidence, Your Honors, that was overwhelming and suggests that any error in admitting the second statement would be harmless. Now, to talk about, substantively, the second statements, we argue that they are dying declarations, that at the point that the victim is in the ambulance, has albuterol treatments, oxygen inhibition as testified by the paramedic, heart rate monitor, is having difficulty breathing, at this point he believes that his death is imminent. He was receiving medical treatment, but the nature of the medical treatment may just compound the belief that death is imminent. We don't really know what his belief was. That's pure speculation on your part. Unfortunately, the victim died, Your Honors, but we don't know what his belief was at that time. We can't talk anymore. Absolutely, but given the circumstances, in Georgia Coppolis, this Court stated that the circumstantial evidence regarding the victim's physical condition is sufficient to use to infer that his belief that death was imminent. Under the facts of this case, and under this Court's statement for Coppolis, we would argue that he believed death was imminent. With regard to the excited utterance component, we would argue that these statements were excited utterances, as found by the trial court, and that they were non-testimonial. The defense counsel indicated that this case was markedly similar to Sutton, and we would argue that it is similar in the excited utterance component, but not in the non-testimonial component. The only similarities between Sutton and this case, as far as the non-testimonial analysis goes, was that they were both in an ambulance. But if one looks more closely at the facts of the case and the statements of both cases, in Sutton, the ambulance was actually on its way to the hospital. Here, the ambulance was still on the scene. In Sutton, the police officer asked the victim, tell me again what you told me before about what happened. I'm paraphrasing, but that was about it. But the Supreme Court made a note of the fact that the police officer used the word again, suggesting that in Sutton, the police officer was actually, at this point, investigating. Here, what we have is the police walking up to the ambulance with a potential offender here, asking, is this the person that shot you? The victim says, yes. The police clarified, are you 100% sure? The victim says, yes. At this point, the police are responding to an ongoing emergency. They want to be sure that the person they have, 100% sure that the person they have is the offender. Why? Because if it's not, then there's potentially an offender in the area walking around with one gun, or two guns, two offenders, it turns out, walking around with guns and shooting people. The police are responding to an ongoing emergency, making sure that the area was indeed secure. And it's important to note the time frame here. The testimony was that the shots fired call was received about 1.58 a.m. The police report indicates that the arrest took place at 2.03 a.m. So while there is some debate as to what the time frame was here, essentially we're looking at potentially five minutes between the time the police received the call and the time the police reported they made the arrest. Clearly, five minutes is a reasonable time for the police to secure a scene, make sure that the offender with the gun is not still in the area shooting people. There are no further questions. For those reasons and those stated in our brief, we ask that this court affirm the defendant's conviction for first degree murder. Thank you. Thank you. Rebuttal? Brief rebuttal? I think that the important thing is obviously there's no basis for this court to overrule the trial court's finding regarding the dying declaration. One, that had to have been found beyond a reasonable doubt on the trial court that the victim knew that death was imminent. The trial court, evaluating the fact, made that determination and found that there was no finding that the speaker thought that death was imminent at that point. And now on appeal, the state's made no showing that this court should overrule the trial court's finding that the trial court abused its discretion when making that factual determination. And secondly, when dealing with the closeness of this case, the state argues that this evidence was overwhelming. I think that, as Your Honors pointed out, we have a witness that appears as lying at some point. He indicated that Loggins saw the shooters, but it was important to note that whatever Loggins' testimony was in terms of the shooting, although he saw two individuals in hoodies on the scene, he didn't actually say it was the two individuals in hoodies who were doing the shootings. He couldn't describe the clothing or what the shooters were wearing or how any of this was actually playing out again because of running away from the scene. And finally, in regards to the statement made, I think that he had indicated that the officers had, whenever they had placed Goodloe in custody, be it five minutes, be it some time later, that at that point the crime scene had been secured, and that was the critical point that Sutton was looking at, was that once that crime scene was secured, that's truly indicative of when the ongoing emergency is cut off, and at that point they're investigating, they're truly obviously investigating a crime when they're furthering any sort of statements of identification and doing a show-up, when they actually present an offender in front of a victim to determine if that was the person. This is clearly the sort of statements that are dealt with in terms of testimonial, and for these reasons they should be excluded under the Sixth Amendment. And to admit this testimony was in denial of Goodloe's right to confrontation, and because of the closeness of the case, the case is evidence not being overwhelming. This error could not be harmless beyond a reasonable doubt, and for these reasons we ask that this Court reverse this conviction and remand the matter for a new trial. Thank you, Your Honors. Thank you. It's a tough case.